UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

KIRKLAND WRIGHT,

                Petitioner,

        v.

U. PO, *Parole Officer, New York Department of Corrections and Community Supervision*, and AN-THONY ANNUCCI, *Acting Commissioner*, *New York Department of Corrections and Community Supervision*,[1]

                Respondents.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
10-CV-5127 (MKB)

MARGO K. BRODIE, United States District Judge:

Petitioner Kirkland Wright, proceeding *pro se*, filed the above-captioned petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254, which this Court received on November 3,

2010, alleging that he was being held in state custody in violation of his federal constitutional

rights. (Pet., Docket Entry No. 1.) Petitioner's claims arise from multiple judgments of

conviction following a jury trial in the Supreme Court of New York, Kings County (the "Trial

---

[1] According to New York Department of Corrections and Community Supervision ("DOCCS") records, Petitioner was released from prison to parole supervision on May 22, 2019. *Parolee Lookup*, N.Y. State Dep't of Corr. & Cmty. Supervision (last visited June 29, 2021), https://publicapps.doccs.ny.gov/ParoleeLookup/Default?idx=0. When a habeas petitioner "is on probation or parole due to the state judgment he is attacking" then "[t]he named respondents shall be the particular probation or parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate." Rule 2 of the Rules Gov'g § 2254 Cases in the U.S. Dist. Cts., advisory committee's note to the 1976 amendment. DOCCS records reveal that Petitioner's parole officer is U. Po. *Parolee Lookup*, *supra*. In addition, the Acting Commissioner of the DOCCS is Anthony J. Annucci. *Acting Commissioner Anthony J. Annucci*, N.Y. State Dep't of Corr. & Cmty. Supervision (last visited June 29, 2021), https://doccs.ny.gov/acting-commissioner-anthony-j-annucci. Accordingly, the Court substitutes these officials as respondents. *See* Fed. R. Civ. P. 25(d).

Court"), for committing two counts of attempted robbery in the first degree, one count of attempted robbery in the second degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. (*Id.* ¶ 5.) Petitioner appealed his conviction to the New York Supreme Court Appellate Division, Second Department (the "Appellate Division"), which affirmed the conviction. *People v. Wright*, 878 N.Y.S.2d 788, 788 (App. Div. 2009). The New York Court of Appeals denied leave to appeal. *People v. Wright*, 13 N.Y.3d 751 (2009) (unpublished table decision). Petitioner also filed a motion under Article 440.10 of the New York Criminal Procedure Law, which the Trial Court denied (the "440 Motion"). (Aff. of Glenn Green, ¶¶ 9, 13, Docket Entry No. 6.) The Appellate Division denied leave to appeal. (*Id.* ¶ 14.) While his petition was pending in this Court, the Appellate Division denied a separate petition for a writ of error *coram nobis*. *People v. Wright*, 923 N.Y.S.2d 852, 853 (App. Div. 2011). The New York Court of Appeals denied Petitioner's motion for leave to appeal. *People v. Wright*, 17 N.Y.3d 823 (2011) (unpublished table decision).

Petitioner's initial and amended petitions in this action indicate an intent to raise all of the claims Petitioner raised in state court, as well as claims based on *Connick v. Thompson*, 563 U.S. 51 (2011), and *Cash v. Maxwell*, 565 U.S. 1138 (2012). (Pet. ¶¶ 16–17; Am. Pet. ¶¶ 5–16, Docket Entry No. 15; Pet'r Supp. Br. 1, Docket Entry No. 17.) In the amended petition that the Court received on September 12, 2011, Petitioner raised an additional claim, arguing that prosecutors failed to inform him of a variation in the plea agreement offered to his accomplice, who testified against Petitioner at trial. (Am. Pet. ¶¶ 5–16.)

For the reasons discussed below, the Court denies Petitioner habeas corpus relief on all claims.

## I. Background

### a. Charges against Petitioner

Petitioner was charged with two counts of attempted robbery in the first degree, one count of attempted robbery in the second degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. (Tr. 1250, 1258–59, 1261.)[2]

### b. Trial

The trial record reflects that Petitioner and his socially close but genealogically distant family member Errol Vannoy[3] conducted a botched armed robbery of a Friendly's restaurant in the fall of 2005. Eyewitnesses could not directly identify the perpetrators because they wore masks over their faces, but the men fled the scene in haste, discarding various items — including clothing, their guns, and their masks — in the surrounding area. In addition, Petitioner's SUV was found down the street from the scene. Although Petitioner escaped, officers captured Vannoy minutes after the robbery. Vannoy testified at Petitioner's trial pursuant to a plea agreement. At trial, Petitioner presented alibi testimony, but other evidence — including eyewitness testimony, DNA evidence, telephone records, documents recovered from the discarded items, and material (including cellular telephones belonging to both Petitioner and

---

[2] "Tr." refers to the transcript of Petitioner's jury trial beginning July 13, 2006 and ending on July 21, 2006. (*See* Tr., Docket Entry Nos. 10-9 & 10-10.) "Sent'g Tr." refers to the transcript of the sentencing hearing held on October 10, 2006. (*See* Sent'g Tr., Docket Entry No. 10-11.) The Court refers to the original page numbers in the trial transcript and transcripts of other state court hearings.

[3] Vannoy testified that he was Petitioner's second cousin. (Tr. 354.) Petitioner's aunt testified that Vannoy was her grandson. (Tr. 319, 329.) Both Vannoy and Petitioner's aunt testified that despite the distant relation, the family members maintained close ties. (Tr. 329, 356–57, 360–61.) However, Petitioner's aunt's testimony that "we are a very close family" was stricken from the record. (Tr. 329.)

Vannoy) recovered from Petitioner's SUV — linked Petitioner to the robbery and corroborated Vannoy's testimony.

### i.  The attempted robbery

At 12:58 AM on November 13, 2005, two armed, black men wearing masks and gloves entered a Friendly's restaurant and began physically pushing people around at gunpoint.  (Tr. 48–54, 59–60, 78–82, 108–09, 123–25, 129–32.)  Eyewitnesses estimated the shorter male[4] to be 5'5" or between 5'4" and 5'6" and estimated the taller male[5] to be 6'1" or 6'2" tall; one eyewitness said the shorter male was "significantly" shorter and the taller male "significantly" taller than the eyewitness' own height of 5'11".  (Tr. 52, 58–59, 79, 124–25, 135–36.)  The taller male "had a big — big hair cut, big hairdo"[6] and carried what appeared to be a black semiautomatic firearm.  (Tr. 109–10, 124–25, 139.)  The shorter male had a silver- or metallic-colored revolver with etching or scratches on the side.  (Tr. 52, 64, 73, 79, 86.)  The armed men ordered one employee into an office, where she pressed a panic alarm.  (Tr. 51, 59–60, 80–81, 124.)  This action angered one of the masked men, who became suspicious that she had alerted authorities.  (Tr. 52, 80–82, 132.)

One employee had managed to escape the restaurant during the robbery and call 911 from outside.  (Tr. 109–11.)  The employee yelled to her boyfriend — who was waiting nearby to pick

---

[4]  Upon his arrest, police recorded certain "pedigree information" about Petitioner indicating that he was a black male born on October 21, 1978, with a height of 5'5" and a weight of 160 lbs.  (Tr. 285.)

[5]  At the time of trial, Vannoy was twenty-eight years old, 6'5" tall, and weighed 215 lbs. (Tr. 352–53.)

[6]  At the time of trial, Vannoy had long dreadlocks, which he displayed for the jury, and testified that he had worn his hair in the same manner for the past eight years.  (Tr. 352–53.)  At the time of his arrest, officers recorded that Petitioner had closely shaved hair.  (Tr. 285.)

up the employee following her shift — to get in his vehicle because the restaurant was being

robbed.  (Tr. 111, 144–45.)  At that point, the two armed men — fearful that police could be en

route — began to flee the restaurant, and the boyfriend got in his car to track them down.  (Tr.

52, 82, 111, 132, 145.)  He observed the two men pass through a hole in a fence behind the

restaurant but was unable to find the men when he drove to the other side of the fence.  (Tr. 145.)

After the men escaped, employees made a second call to police.  (Tr. 82.)

### ii.  Police manhunt and investigation

A few minutes after 1:00 AM, a police canine unit arrived at the restaurant and learned

from another officer who was at the restaurant that the perpetrators may have passed through a

hole in the fence behind the restaurant.  (Tr. 156–58.)  The canine unit tracked a scent through

the hole to a red 2003 Ford Expedition registered to Petitioner[7] and parked behind the restaurant

facing against traffic.[8]  (Tr. 160–62, 258–59, 277–78.)  Police impounded the SUV and later

conducted a search of the vehicle that revealed one of Vannoy's and two of Petitioner's cellular

---

[7]  The vehicle registration listed an address in Farmingville.  (Tr. 259.)  Upon his arrest, Petitioner gave the registration address as his address, (*see* Tr. 285), and multiple witnesses also testified that Petitioner lived at that address, (Tr. 319–20, 377).  In addition, telephone company records identified a voice-over-IP line installed at this address, (Tr. 662, 907), and Petitioner listed that number as one of his telephone numbers at the time of his arrest, (Tr. 285–86).

[8]  Vannoy testified that as he and Petitioner arrived in Petitioner's SUV to commit the robbery, Petitioner stated that he parked his vehicle on this particular side of the road so that their flight from the robbery scene would be easier.  (Tr. 383.)

telephones,[9] Vannoy's wallet,[10] Vannoy's keys,[11] a glove, and a receipt containing Petitioner's name. (Tr. 278, 333–34, 341–43, 346.)

After tracking to the red 2003 Ford Expedition, the canine unit continued its tracking to a nearby wooded area. (Tr. 160–62.) There, the dog located and police evidence technicians recovered a pullover cap, two right-hand brown gardening gloves, and a Smith & Wesson model 643 revolver with live rounds in five of the six chambers,[12] all of which were found stuffed inside a Carhartt-branded ski mask. (Tr. 162, 216–18, 224, 233, 659.) At trial, Vannoy identified several of these items as the items Petitioner used on the night of the robbery while an eyewitness to the robbery identified the revolver as the firearm used by the shorter male in the robbery, and DNA testing of the ski mask revealed that it contained Petitioner's DNA. (Tr. 86–88, 220, 225, 404–07, 611–13, 620–22.)

---

[9] Telephone company records identified one of the telephones as a prepaid phone with unverified registration information. (Tr. 659–60.) Telephone company records identified the second telephone as registered to "Wright Sports" at Petitioner's address. When Petitioner was arrested, Petitioner gave the number associated with that telephone as his own. (Tr. 285–86.) Telephone records identified the third telephone as a prepaid telephone with unverified registration information. (Tr. 671–72.) At trial, Vannoy identified the first prepaid telephone as his own and identified both the "Wright Sports" telephone and the second prepaid telephone as belonging to Petitioner, all three of which the pair had left in Petitioner's SUV immediately prior to commencing the robbery. (Tr. 365, 416–18.)

[10] Vannoy testified that he left his wallet in Petitioner's vehicle immediately prior to commencing the robbery. (Tr. 384–85.) At trial, Vannoy identified the seized wallet as the same one he left in the vehicle. (Tr. 413–15.)

[11] At trial, Vannoy identified the keys recovered from the SUV as his house key and his mother's boyfriend's motorcycle key. (Tr. 412.) Police never recovered the keys to the SUV itself. (Tr. 334–35.)

[12] Later testing and analysis of the firearm determined it to be a .38 caliber revolver, operable, with .38 special Federal Brand ammunition, that had been reported stolen in Rochester in 1988. (Tr. 646.)

Upon discovering the evidence, the canine handling officer "heard crashing through the woods" and "pickets snap on a fence." (Tr. 162.) The canine continued to track to a backyard, where the handler found broken pickets. (Tr. 163.) The presence of multiple police officers interfered with the canine's tracking, which ended in a back yard with a pool. (Tr. 163.)

At 1:25 AM, a second canine unit also responded to the area following the first unit's report that they were in foot pursuit of the robbery perpetrators. (Tr. 178–79.) Within minutes, this second unit heard a fellow officer shouting that he had just seen the perpetrator. (Tr. 181.) The unit's dog located Vannoy in some nearby bushes. (Tr. 182.) After officers arrested Vannoy, the second canine unit attempted to track the other perpetrator. (Tr. 182.)

The dog picked up a scent and led officers to two abandoned jackets — one RathCo-brand jacket and one Sean John-brand jacket — which officers recovered as evidence. (Tr. 183–88, 218–19.) From inside the RathCo jacket, police recovered a pair of Nike golfing gloves, and from one of the exterior pockets, they recovered a Serius-branded ski mask. (Tr. 219, 229.) At trial, Vannoy identified several of these items as those he used on the night of the robbery, and later DNA testing of the ski mask was consistent with Vannoy's DNA and did not match Petitioner. (Tr. 407–08, 613–14.). Inside the Sean John jacket, police observed a dry, red stain on the front/chest portion of the interior lining, and they recovered personal papers and cards from the interior right-side breast pocket. (Tr. 219, 245–46.) Forensic testing revealed that the stain on the jacket was human blood that matched Petitioner's DNA profile. (Tr. 609–11, 620–22.) Among the personal papers was a sales receipt listing Petitioner's name in a section labeled "contact details." (Tr. 236.)

### iii. Vannoy's testimony

Prosecutors called Vannoy to testify against Petitioner. (Tr. 351, 369–72.) Vannoy testified to his lengthy criminal history, including multiple prior robbery convictions and the attempted robbery at Friendly's at issue in Petitioner's trial. (Tr. 355–56, 369–72.) In addition, Vannoy testified concerning the plea agreement he reached with prosecutors.

### 1. Cooperation agreement

Vannoy agreed to enter a guilty plea to four of eight robberies with which he had been charged and, in exchange, prosecutors agreed to consider recommending a minimum sentence of seventeen years of incarceration. (Tr. 369–72, 396–97.) Vannoy testified that he agreed to testify in Petitioner's case because "Umm, basically, you know, I accept my part. You know, I was wrong. I'm man enough to actually step up to the plate and take it for what it is, you know. And [Petitioner] tried to leave me, left me basically to fend for myself." (Tr. 372.) On cross-examination, Vannoy equivocated about whether testifying in Petitioner's case was a condition of his plea agreement. (Tr. 440–45, 449–51, 570.)

Although Vannoy and prosecutors reached an agreement that Petitioner would serve seventeen years in prison, Vannoy testified that he had not been sentenced by the time of Petitioner's trial. (Tr. 580–84.) Vannoy further testified that sentencing had been delayed until after his testimony in Petitioner's case, and he conceded that while his plea agreement required prosecutors to recommend a sentence of not more than seventeen years in prison, the judge could sentence Vannoy to less than that amount. (Tr. 581–84.)

Seven months after Petitioner's jury found him guilty, the judge in Vannoy's case ignored the plea agreement and sentenced Vannoy to ten years in prison, the minimum allowable under the law. (Tr. of Sentencing Hr'g for Errol Vannoy dated Feb. 13, 2007, at 3–5, Docket Entry No.

7-4.)  The sentencing judge said he sentenced Vannoy to a lesser term of imprisonment than contemplated by the plea agreement because of the contents of the presentence investigation report, Vannoy's substantial cooperation with prosecutors since entering his guilty plea, and the sentencing judge's belief that Vannoy demonstrated sincere remorse and was on his way toward rehabilitation.  (*Id.* at 5.)  Importantly, the judge issued this lesser sentence without the consent of the prosecutors.  When asked for their input on Vannoy's sentence, the prosecutors responded that the "People would recommend [seventeen] years followed by five years of post-release supervision."  (*Id.* at 3.)

### 2.    Substantive testimony about the robbery

On the substance of Petitioner's case, Vannoy testified that he and Petitioner were close.  (Tr. 361, 365.)  According to Vannoy, he had discussed with Petitioner the financial problems[13] that Petitioner's family had been having.  (Tr. 360.)

On the evening of the robbery, Petitioner and Vannoy were alone together at Petitioner's home when Petitioner began discussing the prospect of robbing the Friendly's.  (Tr. 377–78.)  After the discussion, Petitioner went into his garage and retrieved a backpack with supplies for the robbery, including a chrome .38 revolver, a black BB gun that resembled a 9 mm firearm, two ski masks, two sets of gloves, and two crowbars for use in opening the restaurant safe.  (Tr. 378–81.)  Vannoy testified that Petitioner drove the pair to Friendly's, stopping for gas along the

---

[13]  Petitioner's wife also testified that she and Petitioner had recently taken on debts, including a mortgage to buy their house and a car loan to purchase Petitioner's SUV, for which their car payments went up compared to their trade-in vehicle.  (Tr. 852–54.)  In addition, Petitioner's wife testified that she was behind on her student loan payments.  (Tr. 887.)  Court records entered into evidence showed that three civil judgments had been entered against Petitioner's wife, totaling over $10,000.  (Tr. 888–93.)

way.  (Tr. 381–82.)  Petitioner parked his vehicle nearby, facing against traffic so that, Petitioner

told Vannoy, their flight from the robbery scene would be easier.  (Tr. 383.)

Vannoy left one of his cellular telephones, his wallet, his chain, and his watch in

Petitioner's glove compartment but kept a second cellular telephone with him during the robbery;

Petitioner left both of his cellular telephones in the truck's center console.  (Tr. 384–85.)  After

leaving the vehicle, the cousins prepared for the robbery near a building next to the restaurant.

(Tr. 386.)  The two men donned their ski masks and Vannoy put on a pair of black Nike gloves;

Petitioner also wore gloves.  (Tr. 384, 386.)  Petitioner pulled out the chrome .38 revolver while

Vannoy took the BB gun.  (Tr. 386.)

The two men entered the restaurant through the back to commence the robbery when

eventually an employee hit a panic button, prompting them to abandon their plan and flee the

scene.  (Tr. 387–90.)  They ran through a break in the fence behind the restaurant, cut through

some woods, and attempted to reach Petitioner's truck when they decided to hide after hearing a

car screeching out of the Friendly's parking lot.  (Tr. 390–92.)  Using Vannoy's telephone,

Petitioner called his wife to ask her to pick the pair up in a taxi.[14]  (Tr. 392.)

Telephone records confirmed that minutes after the robbery, at 1:02 AM on November 13,

2005, a mobile telephone registered to Vannoy placed a 165-second call to Petitioner's home.

(Tr. 649–50, 662, 911–13.)  Moments later, Petitioner's home telephone number made an

outgoing call to 411 directory information at 1:05 AM followed by four calls to three different

taxi services at 1:06 AM, 1:07 AM, 1:11:28 AM, and 1:11:55 AM.  (Tr. 663, 911–13.)  At 1:12

---

[14]  Petitioner's wife, Petitioner's stepson, and Vannoy's girlfriend all testified that
Vannoy, not Petitioner, placed the calls from Vannoy's telephone.  (Tr. 695–96, 710–11, 714,
724, 760, 800, 863–66, 910–11, 914–15.)  Petitioner's wife testified that Petitioner was not on
the telephone and that she never heard him in the background, either.  (Tr. 866.)

AM, the home telephone at Petitioner's address received a 106-second incoming call followed by a 48-second call at 1:14 AM, both from Vannoy's mobile telephone. (Tr. 663, 911–13.) Following these calls, Petitioner's home telephone again made outgoing calls to taxi services at 1:17 AM, 1:18 AM, and 1:20 AM. (Tr. 663–64, 911–13, 916–17.)

After allowing Petitioner to use his telephone to call Petitioner's wife, Vannoy took his mask and gloves and put them in his pocket. (Tr. 393.) Eventually, police saturated the area and the two men began running when they heard police dogs, with Petitioner in the lead. (Tr. 392–93.) After a lot of running, the two men's jackets — Petitioner in a leather, bomber-type jacket and Vannoy in a black Army-style "fatigue" coat — made them warm, so both men removed their jackets. (Tr. 394.) Shortly after discarding their jackets, Petitioner abandoned Vannoy. (Tr. 395.) One of the canine units located Vannoy and placed him under arrest. (Tr. 395–96.) During a post-arrest interview with police, Vannoy confessed to his participation in the attempted robbery. (Tr. 396.)

### iv. Petitioner's wife and Vannoy's girlfriend

At around 1:45 AM or 2:00 AM — less than an hour after the multiple outgoing calls from Petitioner's home telephone to various taxi services — a police detective was outside Petitioner's home, where he observed two black females — Alicia Wright[15] and Natasha Gousse[16] — exit the house and enter a taxi. (Tr. 229, 804, 918.) Wright and Gousse testified that they intended to head to a bar, not help Petitioner and Vannoy escape from a robbery scene. (Tr.

---

[15] Wright, Petitioner's wife, lived with Petitioner at his home. (Tr. 729, 745, 748–49, 847–50.)

[16] Gousse, Wright's niece and Vannoy's girlfriend, also lived in Petitioner's home at the time of the robbery. (Tr. 367–68, 731, 733, 748–49, 755, 784, 805, 818.)

760–61, 805–06, 867–71, 908–09, 915.)  After following the taxi as it headed in the direction of the robbery scene, the detective observed the taxi repeatedly stop, move forward a short distance, then stop again: "It looked like the taxi was looking for something."[17]  (Tr. 260.)

The detective requested that a uniformed patrol vehicle pull over the taxi and subsequently interviewed Wright and Gousse.  (Tr. 260–61, 764–67, 809, 875–77.)  Wright had on two coats,[18] while Gousse had an unsecured wig[19] on her head.  (Tr. 261.)  The two women stated that they were headed to a bar across from the Friendly's that had just been robbed.  (Tr. 261.)  However, the taxi driver told the detective that he became concerned when the two women kept telling him to stop the taxi, and that "he was actually hoping to see a police car, because he thought something might be wrong."  (Tr. 270.)  The detective had the two women brought to a police precinct for questioning, where they were eventually released.  (Tr. 261, 768–69, 877–81, 902–04.)  Police drove Wright and Gousse home, by which time Petitioner still had not returned home.  (Tr. 904–05.)

### v.   Petitioner's call to his aunt

Two days after the robbery, Petitioner called his seventy-eight-year-old aunt to ask her to tell Vannoy "not to say anything to the cops."  (Tr. 320–21.)  Petitioner's aunt heard traffic in the background of the call and thought Petitioner may have been calling from a pay telephone outside.  (Tr. 321, 325.)  When she asked Petitioner where he was, he said, "Brooklyn."  (Tr.

---

[17]  Gousse and Wright testified that they and the taxi driver noticed someone following them and became concerned.  (Tr. 763, 872.)

[18]  Wright testified that she had on a coat and a sweater but not two coats.  (Tr. 909–10.)

[19]  Gousse testified that she did not own a wig and had never worn one.  (Tr. 753–54, 840.)

325–26.)  Petitioner surrendered to the police precinct with his attorney the following day, November 16, 2005.  (Tr. 284–85.)

### vi.  Alibi testimony

Petitioner put on alibi witness testimony from Gina Cooper, his close friend and ex-girlfriend.  (Tr. 972–73, 975.)  Cooper testified that she had recently entered a plea of guilty to a criminal charge stemming from the sale of drugs but that she was not culpable for the underlying crime.  (Tr. 980–82, 997, 1084–85.)

According to Cooper, on the night of the robbery, she and her son lived in a shelter — a room in a motel — administered by the Department of Social Services.  (Tr. 973–74.)  Cooper testified that just before 10:00 PM, Petitioner arrived at the shelter to visit her.  (Tr. 987–88, 1064–65.)  In her room, they talked, consumed drugs, and had sex.  (Tr. 988–89, 1054, 1075.)  According to Cooper's testimony, she did not want to drive Petitioner directly to his house because she did not want Petitioner's wife to see another woman dropping him off, so she drove Petitioner to within a few blocks of his home shortly after 4:00 AM.  (Tr. 989–91, 1070, 1072–73.)

Cooper next spoke with Petitioner again in January or February of 2006 and learned of his arrest for the attempted robbery.  (Tr. 991–92, 1076–78.)  She debated coming forward with her testimony but did not make a final decision to do so until March or April of 2006, when she gave Petitioner's trial counsel a written statement.  (Tr. 993, 1078–79.)  A colloquy held outside the jury's presence established that while Cooper had hesitated in coming forward before, her initial reluctance was not based on the advice of legal counsel, as she was not represented until June 15, 2006.  (Tr. 950–51.)

### c. Verdict and sentencing

The jury found Petitioner guilty of both counts of attempted robbery in the first degree and of the single counts of attempted robbery in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. (Tr. 1315–17.)

At a hearing immediately prior to sentencing, the Trial Court found that Petitioner qualified as a prior violent felony offender. (Sent'g Tr. 31–32.) The Trial Court sentenced Petitioner to fifteen years in prison for both convictions of attempted robbery in the first degree, seven years in prison for the conviction of attempted robbery in the second degree, fifteen years in prison for the conviction of criminal possession of a weapon in the second degree, and seven years in prison for the conviction of criminal possession of a weapon in the third degree, with five years of post-release supervision to follow each prison sentence and all sentences to run concurrently. (Sent'g Tr. 33–35.)

### d. Direct appeals

#### i. Appellate Division

Petitioner appealed his convictions to the Appellate Division, arguing that (1) prosecutors committed misconduct in the course of their cross-examination of his wife Wright and accomplice Gousse, (2) trial counsel provided ineffective assistance by failing to object to cross-examination of his alibi witness Cooper concerning her failure to come forward with her exculpatory information earlier, (3) prosecutors improperly introduced into evidence the confession of his accomplice Vannoy, (4) prosecutors improperly introduced into evidence testimony from his aunt about his telephone call to her, (5) the evidence was insufficient to convict him and his conviction was against the weight of the evidence, and (6) the sentence

imposed was excessive and should be modified in the interest of justice. (Pet'r Appellate Division Br. 19–58, Docket Entry Nos. 10-13 & 16-3.) The Appellate Division affirmed the convictions on May 19, 2009. *Wright*, 878 N.Y.S.2d at 788.

First, the Appellate Division rejected Petitioner's challenge to the sufficiency of the evidence as "without merit" because when "[v]iewing the evidence in the light most favorable to the prosecution, there existed a 'valid line of reasoning and permissible inferences [which] could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial.'" *Id.* at 789 (citation omitted) (alteration in original) (quoting *People v. Elmore*, 855 N.Y.S.2d 556, 557 (App. Div. 2008)). In addition, the Appellate Division declared itself "satisfied that the verdict of guilt was not against the weight of the evidence." *Id.*

Second, the Appellate Division rejected Petitioner's "argument that certain questions posed by the prosecutor to defense witnesses were improper inasmuch as they were designed to elicit irrelevant evidence." *Id.* According to the Appellate Division, Petitioner's claim was "unpreserved for appellate review because [Petitioner] either failed to object, or upon having his objection sustained, failed to seek further relief." *Id.* In addition, the Appellate Division held in the alternative that "to the extent that the questions were improper, the prosecutor's misconduct was 'not so flagrant or pervasive as to deny [Petitioner] a fair trial.'" *Id.* (quoting *People v. Almonte*, 806 N.Y.S.2d 95, 97 (App. Div. 2005)).

Third, the Appellate Division found that prosecutors "laid the proper foundation prior to questioning his alibi witness with respect to her delay in coming forward with exculpatory evidence." *Id.* Specifically, the Appellate Division found that prosecutors "properly established that the alibi witness was aware of the nature of the charges pending against [Petitioner] during the period of delay about which the witness was questioned." *Id.*

Fourth, the Appellate Division rejected Petitioner's argument concerning the admission into evidence of the confession of his accomplice Vannoy. *Id.* The Appellate Division found the claim "unpreserved for appellate review because defense counsel did not object to the document's introduction into evidence." *Id.* In an alternative holding, the Appellate Division held that "the statement was properly admitted" as a matter of state law. *Id.* at 789–90.

Fifth, the Appellate Division held without elaboration that "[t]he sentence imposed was not excessive." *Id.* at 790 (citing *People v. Suitte*, 455 N.Y.S.2d 675 (App. Div. 1982)).

Finally, the Appellate Division held, also without elaboration, that Petitioner's "remaining contentions are without merit." *Id.*

### ii. Court of Appeals

Petitioner sought leave to appeal from the Court of Appeals.[20] The Court of Appeals denied leave to appeal. *People v. Wright*, 13 N.Y.3d 751 (2009) (unpublished table decision).

### e. Post-conviction proceedings

### i. 440 Motion

Petitioner filed a motion pursuant to New York Criminal Procedure Law § 440.10, arguing that the prosecutor failed to correct the testimony of his accomplice Vannoy concerning Vannoy's cooperation and plea agreement.[21] (Aff. of Glenn Green ¶ 9.) Although prosecutors elicited testimony from Vannoy that he could expect to receive a sentence of seventeen years of

---

[20] Petitioner's filings before the Court of Appeals do not appear in this Court's record. The Court therefore assumes — to Petitioner's benefit — that his filings before the Court of Appeals did not fail to exhaust any arguments he made before the Appellate Division. *See Robinson v. Arnone*, No. 12-CV-1323, 2016 WL 223693, at *5 (D. Conn. Jan. 19, 2016); *Hartley v. Senkowski*, No. 90-CV-395, 1991 WL 159085, at *3 (E.D.N.Y. Aug. 7, 1991).

[21] The state court filings related to the 440 Motion do not appear in this Court's record.

incarceration due to the plea agreement, the judge in Vannoy's case later sentenced him to less than seventeen years. (*Id.* ¶ 10.)

The Trial Court denied Petitioner's motion without a hearing on June 21, 2010. (Decl. of Pet'r ¶ 6, Docket Entry No. 13-1.) The Appellate Division denied Petitioner leave to appeal this denial on November 12, 2010. (*Id.* ¶ 7.)

### ii. Petition for writ of error *coram nobis*

Petitioner filed a petition with the Appellate Division for a writ of error *coram nobis* on December 28, 2010. (Decl. of Service for Pet. for Writ of Error *Coram Nobis* 1, Docket Entry No. 7-2.) In that petition, he argued that his appellate counsel had provided ineffective assistance by (1) failing to raise a *Brady* claim related to the sentencing of his accomplice Vannoy to less than the seventeen years for which Vannoy's plea agreement provided, and (2) failing to obtain the transcript of Vannoy's February 13, 2007 plea hearing. (Aff. of Pet'r re: Pet. for Writ of Error *Coram Nobis* ¶¶ 2–3, Docket Entry No. 7-2.)

The Appellate Division denied the petition for a writ of error *coram nobis* on May 17, 2011. *People v. Wright*, 923 N.Y.S.2d 852, 853 (App. Div. 2011). The Appellate Division held, without elaboration, that Petitioner "ha[d] failed to establish that he was denied the effective assistance of appellate counsel." *Id.* The Court of Appeals denied leave to appeal on August 15, 2011. *People v. Wright*, 17 N.Y.3d 823 (2011) (unpublished table decision).

### iii. Petition for habeas corpus

On November 3, 2011, the Court received Petitioner's *pro se* petition for a writ of habeas corpus. (Pet.) The petition indicated an intent to raise each claim raised in state court as well as a separate claim based on *Connick v. Thompson*, 563 U.S. 51 (2011). (*Id.* ¶¶ 15–16.) Petitioner also requested that the Court stay his petition pending further proceedings in state court. (*Id.*

¶ 18.)  Petitioner later amended his petition to add the ineffective assistance of appellate counsel

claim he raised in his petition for a writ of error *coram nobis*.  (Am. Pet. ¶ 12; Order Granting

Leave to Amend 1, Docket Entry No. 14.)  Petitioner later submitted another filing raising a

claim under *Cash v. Maxwell*, 565 U.S. 1138 (2012).  (Pet'r Supp. Br. 1.)

## II.  Discussion

### a.  Standard of review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody

pursuant to a state court judgment may only be brought on the grounds that his or her custody is

"in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A petitioner is required to show that the state court decision, having been adjudicated on the

merits, is either "contrary to, or involved an unreasonable application of, clearly established

Federal law" or "based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  *Id.* § 2254(d)(1)–(2); *see also Shoop v. Hill*, 586

U.S. ---, ---, 139 S. Ct. 504, 506 (Jan. 7, 2019) (per curiam) ("[H]abeas relief may be granted

only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an

unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time

of the adjudication." (quoting *White v. Woodall*, 572 U.S. 415, 419–20 (2014))); *Kernan v.*

*Hinojosa*, 578 U.S. ---, ---, 136 S. Ct. 1603, 1604 (May 16, 2016) (per curiam); *Hittson v.*

*Chatman*, 576 U.S. 1028, 1028 (2015) (mem.); *Woods v. Donald*, 575 U.S. 312, 313 (2015) (per

curiam); *Johnson v. Williams*, 568 U.S. 289, 292 (2013).  "An 'adjudication on the merits' is one

that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  *Bell*

*v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 U.S. 303, 312 (2d

Cir. 2001)); *see also Kernan*, 578 U.S. at ---, 136 S. Ct. at 1606; *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Under the section 2254(d) standards, a state court's decision must stand as long as "'fairminded jurists could disagree' on the correctness of the . . . decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the [state] [c]ourt's decision."). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law, (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts, or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *See Williams*, 529 U.S. at 412–13. In order to establish that a state court decision is an unreasonable application of federal law, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.*

A court may also grant habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[S]tate-court factual determination[s] [are

not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Rather, factual determinations made by the state court are "presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Even if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to'" overturn a state court factual determination. *Wood*, 558 U.S. at 301 (alteration in original) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). A court may overturn a state court's factual determination only if the record cannot "plausibly be viewed" as consistent with the state court's fact-finding or if "a reasonable factfinder must conclude" that the state court's decision was inconsistent with the record evidence. *Rice*, 546 U.S. at 340–41.

**b.  Jurisdictional issues — mootness and custody**

Before turning to the merits, the Court must determine whether Petitioner's 2019 release from incarceration and subsequent deportation moots this case or prevents the case from satisfying the statutory "in custody" requirement. For the reasons explained below, neither jurisdictional issue precludes the Court from adjudicating this case.

Although neither party has addressed any jurisdictional issues, the Court has an independent obligation to assure itself that it possesses subject matter jurisdiction over the case. *See, e.g.*, *Winston v. City of Syracuse*, 887 F.3d 553, 558 n.3 (2d Cir. 2018). Because mootness deprives a federal court of subject matter jurisdiction, the Court must *sua sponte* determine whether this case is moot. *See Coll. Std. Mag. v. Student Ass'n of State Univ. of N.Y. at Albany*, 610 F.3d 33, 35 (2d Cir. 2010). District courts likewise lack jurisdiction over habeas petitions

filed by petitioners who are not "in custody" as that term is used in 28 U.S.C. § 2254(a). Therefore, the Court must *sua sponte* determine whether Petitioner meets this statutory requirement. *See Nowakowski v. New York*, 835 F.3d 210, 215 n.5 (2d Cir. 2016).

### i. Mootness

This case is not moot. The mootness doctrine prohibits federal courts from issuing judicial decisions in a case — even if that case once featured a live controversy — if subsequent developments since the filing of the litigation render a federal court unable to grant any effectual relief to the prevailing party. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013). In the habeas context, petitions for post-conviction relief are not moot so long as portions of a petitioner's sentence imposed for the conviction(s) under collateral attack remain unserved. *See Kernan v. Cuero*, 583 U.S. ---, ---, 138 S. Ct. 4, 7 (Nov. 6, 2017) (per curiam). This includes terms of post-release supervision. *See Janakievski v. Exec. Dir., Rochester Psych. Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020). Even if the expired sentence of incarceration itself is the target of the collateral attack (as opposed to the conviction for which the sentence was imposed), a petition attacking such a sentence is not moot where the petitioner remains subject to supervised release "because the possibility of the district court's reducing the term of supervised release on remand gives the [habeas petitioner] a continuing stake in the outcome."[22] *United States v. Blackburn*, 461 F.3d 259, 262 (2d Cir. 2006) (collecting cases).

---

[22] There is an exception:

> [Where] the possibility of the [sentencing] court's imposing a reduced term of supervised release on remand is so remote and speculative that any decision on the merits of [the habeas petitioner]'s claim would amount to a "declar[ation of] principles or rules of law which cannot affect the matter in issue in the case before [the federal habeas court]," and would thus run afoul of Article III's

Petitioner was sentenced to a total of fifteen years of incarceration followed by five years of post-release supervision. (Sent'g Tr. 33–35.) According to DOCCS records, Petitioner was released from prison to parole supervision on May 22, 2019, and deported effective June 27, 2019.[23] Under New York law, a parolee remains subject to post-release supervision for the duration of the term of supervision even if that parolee is deported. *People ex rel. Calderon v. Russi*, 582 N.Y.S.2d 766, 767 (App. Div. 1992). Therefore, Petitioner remains subject to post-release supervision until the expiration of his term of supervised release — that is, through mid-2024 — notwithstanding his removal from the United States. Because Petitioner remains subject to post-release supervision, his habeas petition is not moot.

## ii. Custody

Petitioner also meets the statutory "in custody" requirement. As with mootness, the "in custody" requirement limits the jurisdiction of district courts to issue writs of habeas corpus as only "a person in custody pursuant to the judgment of a State court" may successfully petition for habeas corpus. 28 U.S.C. § 2254(a). However, a person need only satisfy this requirement at the time of filing the petition. *Nowakowski*, 835 F.3d at 215. In addition, being subject to post-release supervision following a term of incarceration also satisfies the "in custody" requirement. *See Dearstyne v. Mazzuca*, 679 F. App'x 21, 22 n.1 (2d Cir. 2017).

---

restriction of [the federal habeas court's] power[, the collateral attack on the sentence is moot].

*United States v. Blackburn*, 461 F.3d 259, 262 (2d Cir. 2006) (citation omitted) (fourth alteration in original) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). A case meets this exception only if the sentencing court gave some explicit indication that a reduction in time on supervised release would be unlikely if the collateral attack on the sentence succeeded. *See United States v. Hobdy*, 692 F. App'x 652, 653 (2d Cir. 2017); *United States v. Mukhtaar*, 355 F. App'x 541, 542 (2d Cir. 2009). The Trial Court made no such statement when sentencing Petitioner. (Sent'g Tr. 31–35.)

[23] The state court record reveals that Petitioner is a citizen of Jamaica. (Sent'g Tr. 19.)

Petitioner was incarcerated in 2010 at the time he filed his petition. (Pet. ¶ 4.) As mentioned above, Petitioner remains subject to an unexpired term of post-release supervision through mid-2024, despite his deportation. *Russi*, 582 N.Y.S.2d at 767. For both these reasons, Petitioner satisfies the "in custody" requirement of § 2254(a).

### c. Improper prosecutorial cross-examination

Petitioner's first claim is that prosecutors improperly cross-examined defense witnesses Wright and Gousse. Because Petitioner has procedurally defaulted the claim, it does not entitle Petitioner to federal habeas relief.

"[A] federal court may not review federal claims that were procedurally defaulted in state court — that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. ---, ---, 137 S. Ct. 2058, 2064 (June 26, 2017). "'To qualify as an adequate procedural ground,' capable of barring federal habeas review, 'a state rule must be firmly established and regularly followed.'" *Johnson v. Lee*, 578 U.S. ---, ---, 136 S. Ct. 1802, 1803 (May 31, 2016) (per curiam) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)). New York Criminal Procedure Law § 470.05(2) constitutes just such an independent and adequate state procedural rule which operates to bar federal habeas relief. *See, e.g.*, *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) ("[T]he Appellate Division's express reliance on the state's contemporaneous objection rule in rejecting [a plaintiff's] appeal constitutes an 'independent' state law ground for that decision."); *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."); *see also Hamilton v. Lee*, 707 F.

App'x 12, 14 (2d Cir. 2017) ("New York's contemporaneous objection rule is an independent and adequate state procedural rule.").[24]

The Appellate Division denied Petitioner's claim concerning improper cross-examination, finding that the claim was "unpreserved for appellate review because the defendant either failed to object, or upon having his objection sustained, failed to seek further relief." *Wright*, 878 N.Y.S.2d at 789 (citing N.Y. Crim. Proc. L. § 470.05(2)). The record supports the Appellate Division's characterization of Petitioner's trial counsel's objections. (Tr. 771–72, 828–30, 1025–26, 1028–29, 1032–33, 1051–52, 1076–77.) Accordingly, Petitioner's claim is procedurally defaulted. *See Watkins v. Perez*, No. 05-CV-477, 2007 WL 1344163, at *17 (S.D.N.Y. May 7, 2007) (finding claim concerning improper cross-examination of witnesses procedurally defaulted where "defense counsel never objected during . . . cross-examination to the prosecutor's various questions" and collecting cases).

---

[24] "A federal *habeas* petitioner may seek review of his federal claims notwithstanding the existence of independent and adequate state law grounds for the state court'[s] decision in three circumstances . . . ." *Medina v. Gonyea*, 111 F. Supp. 3d 225, 233–34 (E.D.N.Y. 2015). First, "[a] *habeas* petitioner may bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). Second, there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2d Cir. 2002). Third, a court may review such claims where a petitioner shows "cause for or prejudice from the failure to raise the claim, and failing to consider it will . . . result in a 'fundamental miscarriage of justice.'" *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 201–02 (2d Cir. 2010) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Petitioner does not raise these arguments. *See Medina*, 111 F. Supp. 3d at 233–34 (declining to review the petitioner's claims that were disposed of in state court on independent and adequate state grounds where the petitioner "[did] not argue he is actually innocent, nor . . . allege any exorbitant application of [the state law ground], nor . . . claim cause or prejudice").

### d. Ineffective assistance of counsel — improper prosecutorial cross-examination

Petitioner claims that his trial counsel provided ineffective assistance by failing to object to certain cross-examination questions of his alibi witness Cooper. Specifically, Petitioner alleges that prosecutors failed to lay a proper foundation before asking Cooper about her failure to come forward with her exculpatory information prior to trial. Because the Appellate Division did not unreasonably determine the facts or unreasonably apply clearly established Supreme Court precedent when it held that prosecutors in fact "laid the proper foundation prior to questioning [Petitioner's] alibi witness with respect to her delay in coming forward with exculpatory evidence," Petitioner is not entitled to relief on this claim. *Wright*, 878 N.Y.S.2d at 789.

Criminal defendants are entitled to the effective assistance of counsel — that is, entitled to professionally competent counsel whose assistance meets or exceeds an objective standard of reasonableness. *See Lee v. United States*, 582 U.S. ---, ---, 137 S. Ct. 1958, 1964 (June 23, 2017); *see also Santone v. Fischer*, 689 F.3d 138, 153–54 (2d Cir. 2012). However, trial counsel cannot be ineffective for failing to raise meritless arguments. *See Lafler v. Cooper*, 566 U.S. 156, 167 (2012); *see also United States v. Fusco*, 560 F. App'x 43, 46 (2d Cir. 2014).

As the Appellate Division held, trial counsel could not have successfully objected to prosecutors' cross-examination of Cooper about her failure to come forward with her alibi testimony. Under applicable New York law, prosecutors seeking to cross-examine a defense witness about "the failure of [that] defense witness to come forward and present to law enforcement officials information tending to exculpate the defendant . . . must lay a proper foundation for the cross-examination of such a witness." *People v. Stokes*, 722 N.Y.S.2d 753–54 (App. Div. 2001). Namely, prosecutors must "show[] that the witness was aware of the nature of the charges pending against the defendant, had reason to recognize that he or she possessed

exculpatory information, had a reasonable motive for acting to exonerate the defendant, and was familiar with the means for providing information to law enforcement authorities." *Id.* at 754. "In addition, the prosecutor must demonstrate that the witness's silence was not the product of the defense counsel's advice to keep silent." *Id.*

Prosecutors established all the necessary requirements in this case. Cooper testified that she and Petitioner consumed drugs and had sex between 10:00 PM on November 12, 2005, and 4:00 AM on November 13, 2005 — a period during which, prosecutors contended, Petitioner was committing a robbery. Cooper next spoke with Petitioner in January or February of 2006, when she learned of his arrest for the robbery the prior November. According to Cooper, she debated coming forward with her testimony but did not make a final decision to do so until March or April of 2006, when she gave Petitioner's trial counsel a written statement. Prior to Cooper's testimony, a colloquy established that her initial reluctance to testify was not based on the advice of legal counsel, as she was not represented until June 15, 2006 — and none of the prosecutors' questioning concerned the period after June 15, 2006. As the Appellate Division held, Cooper's testimony satisfied all of the foundational requirements for prosecutors to inquire about her refusal to come forward sooner. Because any objection to prosecutors' foundation would have failed, Petitioner's trial counsel cannot have been ineffective for failing to lodge such an objection. By so ruling, the Appellate Division did not unreasonably determine the facts or unreasonably apply clearly established Supreme Court precedent.

### e. Introduction of codefendant's confession and related ineffective assistance of counsel claim

Petitioner claims that prosecutors improperly introduced into evidence the out-of-court confession of Petitioner's accomplice Vannoy, but this claim is procedurally defaulted.

"[A] federal court may not review federal claims that were procedurally defaulted in state court — that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at ---, 137 S. Ct. at 2064. "'To qualify as an adequate procedural ground,' capable of barring federal habeas review, 'a state rule must be firmly established and regularly followed.'" *Johnson*, 578 U.S. at ---, 136 S. Ct. at 1803 (quoting *Walker*, 562 U.S. at 316). New York Criminal Procedure Law § 470.05(2) constitutes just such an independent and adequate state procedural rule which operates to bar federal habeas relief. *Whitley*, 642 F.3d at 286 ("[T]he Appellate Division's express reliance on the state's contemporaneous objection rule in rejecting [a plaintiff's] appeal constitutes an 'independent' state law ground for that decision."); *Downs*, 657 F.3d at 104 ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."); *see also Hamilton*, 707 F. App'x at 14 ("New York's contemporaneous objection rule is an independent and adequate state procedural rule.").

The Appellate Division denied Petitioner's claim concerning the introduction of his codefendant Vannoy's out-of-court confession, holding that the claim was "unpreserved for appellate review because defense counsel did not object to the document's introduction into evidence." *Wright*, 878 N.Y.S.2d at 789 (citing N.Y. Crim. Proc. L. § 470.05(2)). The record supports the Appellate Division's finding. (Tr. 553–54.) Having failed to comply with the state's procedural rule requiring contemporaneous objections, Petitioner may not now obtain federal habeas relief in this Court. *See Scott v. Fisher*, 652 F. Supp. 2d 380, 384–85, 404–06 (W.D.N.Y. 2009) (finding claim that trial court improperly admitted codefendant's written statement to police inculpating the petitioner procedurally defaulted where defense counsel failed to object to admission).

In a single sentence in his brief on direct appeal, Petitioner argued that his trial counsel's failure to object to the admission of the codefendant's written statement rendered trial counsel ineffective. (Pet'r Direct Appeal Br. 45, Docket Entry No. 45.) The Appellate Division did not treat such an underdeveloped, conclusory assertion as a distinct claim and did not address the single sentence in the section of its opinion dealing with the accomplice's written statement. *See Wright*, 878 N.Y.S.2d at 789–90. Petitioner's filings in this Court likewise make no attempt to develop this argument. Accordingly, the Court declines to address whether trial counsel's failure to object to the admission of the accomplice's confessional statement constituted ineffective assistance of counsel. *See, e.g.*, *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 535 (2d Cir. 2020) (rejecting "this claim on the basis of waiver" where the *pro se* litigant "devot[ed] only one conclusory sentence to [the claim] in her brief" (citing *Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728 F.3d 139, 142 n.4 (2d Cir. 2013))).

    **f.    Improper admission of Petitioner's statement to his aunt**

Petitioner claims that prosecutors improperly admitted the testimony of Petitioner's aunt, who alleged that Petitioner told her to instruct Petitioner's accomplice Vannoy not to speak with the police. This alleged error of state evidence law is not cognizable on federal habeas review.

The Supreme Court has clearly articulated that a perceived error of state law is not a ground upon which the writ of habeas corpus may issue. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991); *id.* at 67 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))); *Wright v. Duncan*, 500 F. App'x 36, 38 (2d Cir. 2012) ("A federal habeas court generally does not review purported errors of state law." (citing *Estelle*, 502 U.S. at 67–68)).

Because the improper admission of evidence in a state court proceeding is an issue of state law, it is not cognizable on federal habeas review. *See Griggs v. Lempke*, 797 F. App'x 612,

615 (2d Cir. 2020) ("Merely showing that the state court admitted evidence in violation of state rules of evidence is not enough, for such a state court decision on state law, even if erroneous, is not an independent ground for the writ of habeas corpus to issue . . . ."); *Taylor v. Connelly*, 18 F. Supp. 3d 242, 258 (E.D.N.Y. 2014) (finding that, even if hearsay evidence was erroneously admitted, it did not render the trial fundamentally unfair and thus was not material and did not rise to the level of a constitutional violation). Accordingly, Petitioner is not entitled to relief based on this claim.

### g. Sufficiency of the evidence

Petitioner claims that the record lacks sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that he committed the crimes for which he was convicted.[25] Because the Appellate Division's ruling to the contrary did not unreasonably determine the facts or unreasonably apply clearly established Supreme Court precedent, this claim does not entitle Petitioner to federal habeas relief.

"[F]ederal habeas courts must consider a petitioner's federal due process claim that the evidence in support of his conviction was insufficient to have led a rational trier of fact to find him guilty beyond a reasonable doubt." *Justices of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 303 n.5 (1984). "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7

---

[25] In state court, Petitioner also challenged the weight of the evidence. "Weight of the evidence" claims are state law claims not cognizable on federal habeas review. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (noting that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal"); *see also McKinnon v. Superintendent*, 422 F. App'x 69, 75 (2d Cir. 2011); *Jean-Baptiste v. Artus*, No. 09-CV-5920, 2012 WL 12906287, at *14 (S.D.N.Y. June 9, 2012) (collecting cases), *report and recommendation adopted*, 2016 WL 7118280 (S.D.N.Y. Dec. 6, 2016).

(2011) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Pilon v. Bordenkircher*, 441 U.S. 1, 2 (1979) (per curiam). The inquiry "focuses on whether *any* rational juror could have convicted." *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (emphasis added). Stated in the negative, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if *no* rational trier of fact could have agreed with the jury." *Smith*, 565 U.S. at 2 (emphasis added). This "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

This "deferential federal standard . . . leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial." *Coleman v. Johnson*, 566 U.S. 650, (2012) (per curiam). Therefore, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326); *see also House v. Bell*, 547 U.S. 518, 538 (2006). This is because "[i]t is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial." *Smith*, 565 U.S. at 2. This "limited review" ensures courts "do[] not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Musacchio v. United States*, 577 U.S. ---, ---, 136 S. Ct. 709, 715 (Jan. 25, 2016) (quoting *Jackson*, 443 U.S. at 319). The "deferential standard" precludes "fine-grained factual parsing" of the record. *Coleman*, 566 U.S. at 655. Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

Further, because of the "twice-deferential standard" applicable to sufficiency of the evidence challenges on federal habeas review, a petitioner faces an even higher hurdle. *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). The standard is twice-deferential because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review." *Smith*, 565 U.S. at 7. Such "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Matthews*, 567 U.S. at 43 (quoting *Smith*, 565 U.S. at 2). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that [federal] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Smith*, 565 U.S. at 2.

The trial record amply supports the reasonableness of the Appellate Division's decision. Multiple eyewitnesses testified about the two masked, black male gunmen who entered the Friendly's restaurant. Petitioner fit the general description of the shorter gunman. Officers testified that they caught one of the perpetrators — Vannoy — within minutes of the attempted robbery. Vannoy, whose testimony this Court must assume the jury credited, testified in detail about Petitioner's participation in the crime. Telephone records supported Vannoy's testimony. In addition, DNA evidence linked Petitioner to discarded items near the crime scene, and both Vannoy's and eyewitnesses' testimony linked those items — including the .38 revolver — to the crime. Petitioner's truck was parked near the site of the botched robbery containing both his and Vannoy's cellular telephones. Petitioner's aunt testified that just before surrendering to police, Petitioner asked her to tell Vannoy — the aunt's grandson — not to speak with police. Although Petitioner presented alibi testimony, a court reviewing the sufficiency of the evidence must assume that the jury discredited that testimony.

In sum, ample evidence from the trial record supports the Appellate Division's conclusion that sufficient evidence existed to find beyond a reasonable that Petitioner committed the crimes for which he was convicted. The Appellate Division did not unreasonably apply clearly established Supreme Court precedent or unreasonably determine the facts by rejecting this claim. *See, e.g.*, *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction . . . ." (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979))); *see also United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) ("[A] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable." (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005))).

### h.  Sentencing claim

Petitioner claims that his sentence should be reduced or modified in the interest of justice. This claim, which is based on New York Criminal Procedure Law § 470.26(6), is a state law claim not cognizable on federal habeas review. *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012) ("[A] question of state law *in toto* . . . is not subject to federal habeas review.")

In the course of this state law argument, Petitioner's brief on direct appeal also references the Eighth Amendment and *Weems v. United States*, 217 U.S. 349 (1910), a Supreme Court decision touching on constitutionally excessive sentences. (Pet'r Appellate Division Br. 54.) While this suffices to exhaust an Eighth Amendment challenge to Petitioner's sentence, *see Koso v. Att'y Gen. of N.Y.*, No. 12-CV-1723, 2015 WL 1286014, at *3 (E.D.N.Y. Mar. 20, 2015), the Eighth Amendment claim[26] cannot succeed on its merits.

_____

[26]  In addition to the gross disproportionality challenge described below, courts in the Second Circuit recognize an additional type of Eighth Amendment challenge to a sentence: the Eighth Amendment forbids a sentence which exceeds the statutory maximum sentence for the

"[T]he Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'"  *Graham v. Florida*, 560 U.S. 48, 59–60 (2010) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring in part and concurring in judgment)).  To determine whether a crime is grossly disproportionate, a reviewing court must "compar[e] the gravity of the offense and the severity of the sentence."  *Id.* at 60.

"The precise contours of [the gross disproportionality principle] are unclear, [and are] applicable only in the 'exceedingly rare' and 'extreme' case."  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in judgment)).  This creates an extra burden for a federal habeas petitioner: not only must a habeas petitioner show that his or her case qualifies as the "exceedingly rare" type of "extreme case" in which a sentence was not merely disproportionate but *grossly* disproportionate, but in light of the deferential review required by 28 U.S.C. § 2254(d), the habeas petitioner must show that the state court *unreasonably determined* that to be the case.  *Id.* at 76.  In other words, a petitioner faces an extraordinary hurdle to succeed on the merits, and faces a cumulatively extraordinary hurdle to succeed on federal habeas review.

The Appellate Division did not unreasonably apply clearly established Supreme Court precedent or unreasonably determine the facts by upholding Petitioner's sentence.  The

---

crimes of conviction.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.");  *Dantzler v. Superintendent*, No. 09-CV-1513, 2009 WL 3055297, at *5 (E.D.N.Y. Sept. 22, 2009).  Petitioner appears not to have brought this type of claim.  Petitioner's main brief on direct appeal conceded that his fifteen-year sentence fell within the permissible range established by state law.  (Pet'r Appellate Division Br. 57, Docket Entry Nos. 10-3 & 16-3.)

attempted robbery in this case was a serious crime: Petitioner shoved a loaded gun in the face of innocent victims in an effort to unlawfully line his own pockets, then fled from capture and attempted to use a mutual family member to pressure his accomplice/cousin Vannoy not to implicate him to police. In addition, this was not Petitioner's first brush with the law. At sentencing, the Trial Court found that Petitioner qualified as a prior violent felony offender. Petitioner has not shown that the Appellate Division unreasonably determined the facts or unreasonably applied clearly established Supreme Court precedent by finding that Petitioner's maximum sentence — fifteen years of incarceration followed by five years of post-release supervision — was not excessive. *See Ewing v. California*, 538 U.S. 11, 28–31 (2003) (finding that three strikes sentence of twenty-five years to life imposed on a defendant convicted of stealing $1,197 worth of golf clubs was not grossly disproportionate under the Eighth and Fourteenth Amendments); *Williams v. Donnelly*, No. 00-CV-4445, 2005 WL 2290592, at *13 (E.D.N.Y. Apr. 12, 2005) (collecting cases).

### i. Claims related to the cooperating accomplice's sentencing

The claims Petitioner brought in state court other than through his direct appeal[27] concerned the ten-year prison sentence Petitioner's accomplice Vannoy received at his sentencing rather than the seventeen-year sentence Vannoy testified at Petitioner's trial he expected to receive.

---

[27] It appears that Petitioner brought some of these claims in his 440 Motion. However, as mentioned above, the filings related to this motion — including the Trial Court's decision denying the motion — do not appear in the Court's record. The Court is therefore unable to review the Trial Court's decision to determine whether it unreasonably determined the facts or unreasonably applied clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d). Rather than further delay this case to obtain a copy of the Trial Court's decision under Article 440, the Court reviews Petitioner's claims *de novo*, without the prosecutor-friendly deference normally required by section 2254(d) — similar to the standard the Court would have applied if Petitioner had never brought these claims before state courts. *Cf. Medina*, 111 F. Supp. 3d at 236.

Petitioner, a *pro se* litigant, brings essentially three related claims, which the Court construes liberally to raise the strongest arguments his filings suggest. *See United States v. Pilcher*, 950 F.3d 39, 44 (2d Cir. 2020). First, Petitioner contends that prosecutors unethically solicited false testimony from Vannoy that he would receive a sentence of seventeen years of incarceration when in fact prosecutors and Vannoy both knew he would receive a sentence of ten years, what might best be described as an *Agurs*[28] claim. Second, Petitioner contends that prosecutors improperly withheld this information from him, essentially a *Brady*[29] claim. Third, Petitioner argues that Vannoy's sentencing to a term of imprisonment other than the term contemplated by Vannoy's plea agreement entitles Petitioner to a new trial, and argument that Petitioner describes as a *Santobello*[30] claim. As explained below, none of these claims have merit.[31]

---

[28] *United States v. Agurs*, 427 U.S. 97, 103, 113 (1976) (holding that, in cases where "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," the constitutional right to a fair trial requires the judgment of conviction to be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

[29] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

[30] *Santobello v. New York*, 404 U.S. 257, 262 (1971) (stating that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled").

[31] Because Petitioner's *Agurs*, *Brady*, and *Santobello* claims cannot succeed, Petitioner likewise cannot succeed on his related claim that his appellate counsel was ineffective for failing to raise these claims on direct appeal. Counsel cannot be ineffective for failing to raise meritless arguments. *See Lafler v. Cooper*, 566 U.S. 156, 167 (2012); *United States v. Fusco*, 560 F. App'x 43, 46 (2d Cir. 2014).

### i.    *Agurs* Claim

Vannoy's testimony at Petitioner's trial accurately described the circumstances surrounding his plea agreement, therefore, Petitioner's *Agurs* claim for false testimony is without merit.

"The clearly established Supreme Court precedent relevant to [an *Agurs* claim] is that the conviction must be set aside if (1) the prosecution actually knew of [a witness'] false testimony, and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009). Of course, there must in fact be some false testimony before these two elements can be satisfied. *See United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) ("In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial." (quoting *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009))).

The record demonstrates that there was no false testimony that could be the subject of an *Agurs* claim. Vannoy testified at Petitioner's trial that he and prosecutors reached an agreement that Petitioner would serve seventeen years in prison, and conceded that his sentencing had been delayed until after Petitioner's trial. Vannoy further testified that while his plea agreement required prosecutors to recommend a sentence of not more than seventeen years in prison, the judge could sentence Vannoy to less than that amount. At Vannoy's sentencing seven months after Petitioner's trial, prosecutors recommended that Petitioner receive a sentence of seventeen years, just as Vannoy testified they would. The judge nevertheless rejected the prosecutors'

recommendation and sentenced Petitioner to the lesser term of ten years in prison, just as Vannoy testified could occur.

In other words, Vannoy's testimony accurately described the circumstances surrounding his plea agreement. Petitioner's *Agurs* claim therefore fails.

### ii. *Brady* Claim

Petitioner's *Brady* claim likewise cannot succeed. "In *Brady v. Maryland*, 373 U.S. 83 (1963), [the Supreme] Court held that the government violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and *material* to the defendant's guilt or punishment.'" *Turner v. United States*, 582 U.S. ---, ---, 137 S. Ct. 1885, 1888 (June 22, 2017) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). However, both the Supreme Court and the Second Circuit have observed that (unlike criminal defendants at or before trial) post-conviction movants and habeas corpus petitioners lack a *Brady* right to the disclosure of material, favorable evidence. *See Dist. Atty's Off. for 3d Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (explaining that, post-conviction, a movant's right to due process "is not parallel to a trial right, but rather must be analyzed in light of fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief" and thus "*Brady* is the wrong framework"); *Pierre v. Doorley*, 830 F. App'x 58, 59 (2d Cir. 2020) ("The Supreme Court has held that post-conviction defendants do not have a constitutional right to disclosure of exculpatory evidence in the way that pre-conviction defendants do pursuant to *Brady v. Maryland*." (citing *Osborne*, 557 U.S. at 69)). In other words, prosecutors' *Brady* disclosure obligation ceases at the moment of conviction.[32]

---

[32] The Court notes that the fact that prosecutors' *Brady* disclosure obligation ends at judgment does not insulate prosecutors from accountability for earlier, prejudgment *Brady*

Petitioner's concern is that prosecutors failed to disclose to him a sentencing judge's decision to impose on Vannoy a term of incarceration of ten years, less than the prison term of seventeen years contemplated by Vannoy's plea agreement. Petitioner's claim fails because Vannoy's sentence was imposed in February of 2007, seven months after Petitioner's jury found him guilty in July of 2006 and four months after his own sentencing in October of 2006. By the time of Vannoy's sentencing, prosecutors' *Brady* obligation had dissolved; prosecutors cannot have violated *Brady* for a post-conviction failure to disclose. *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) ("With respect to *when* the prosecution must make a disclosure required by *Brady*, the law . . . appears to be settled. *Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding." (citation omitted) (quoting *United States v. Coppa (In re United States)*, 267 F.3d 132, 135 (2d Cir. 2001)) (first citing *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001); then citing *United States v. Persico*, 164 F.3d 796, 804 (2d Cir. 1999); and then citing *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992))).

### iii. *Santobello* claim

Petitioner's *Santobello* claim is without merit because he lacks a due process interest in Vannoy's plea agreement that would warrant relief in the event prosecutors violated Vannoy's plea agreement, and, moreover, prosecutors did not breach Vannoy's plea agreement.

Under *Santobello*, "[a] defendant is deprived of due process when the government breaches a plea-agreement provision on which the defendant relied 'in any significant degree' when entering the guilty plea." *United States v. Doyle*, 545 F. App'x 73, 75 (2d Cir. 2010) (quoting *United States v. Eberhard*, 525 F.3d 175, 178 (2d Cir. 2008)). There are two critical

---

violations. A post-conviction movant or habeas petitioner may obtain post-judgment relief for these prejudgment *Brady* violations. *See, e.g.*, *Fuentes v. T. Griffin*, 829 F.3d 233, 252–53 (2d Cir. 2016).

requirements in this formulation.  First, *the government* must breach the agreement.  No breach

occurs when a sentencing court, acting on its own, issues a sentence different than the one

contemplated by the plea agreement.  *See United States v. Simmons*, 382 F. App'x 63, 64 (2d Cir.

2010) (explaining that plea agreements are contractual in nature and that the sentencing court

therefore could not have breached the agreement because it was not a party to the contract);

*Harris v. United States*, 380 F. Supp. 2d 278, 285 n.6 (S.D.N.Y. 2005) ("A plea agreement is a

contractual agreement between the Government and the defendant to which the Court is not a

party.  The Court cannot breach an agreement to which it is not a party.").  Second, when the

government does violate a plea agreement, the due process rights of *the pleading defendant* are

violated.  Non-parties to the agreement suffer no due process deprivation as a result of a breach

of another defendant's plea agreement.  Plea agreements are similar to contracts, and with special

safeguards designed to meet the unique context of the criminal justice system, are subject to

general contract law principles.  *See United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011).

"Under general contract law principles, a contract typically vests only its signatories with rights,

and non-parties usually have no substantive interest in seeing the contract enforced."  *Hillside*

*Metro Assocs. v. JPMorgan Chase Bank, N.A.*, No. 10-CV-1772, 2011 WL 5008368, at *7

(E.D.N.Y. Oct. 20, 2011).  The word "typically" indicates an exception: where the contracting

parties intend their contract to benefit a third party (so-called "third-party beneficiaries").  *See*

*Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir. 2005).  Therefore, only the

pleading defendant possesses a due process interest in prosecutors' adherence to the plea

agreement, with a possible exception in which a defendant enters into a plea agreement with the

intent to benefit another (for instance, an agreement to plead guilty in exchange for a

commitment to spare a spouse from prosecution).  *See Santobello v. United States*, No. 95-CV-

4404, 1998 WL 113950, at *3 (S.D.N.Y. Mar. 12, 1998) (noting that "there is little known authority that would allow [the petitioner] to enforce [his codefendants' plea] agreements as a third party beneficiary" and collecting cases).

Petitioner lacked a *Santobello*-type due process interest in Vannoy's plea agreement that would warrant any relief had prosecutors breached the agreement. Petitioner is not a party to Vannoy's plea agreement. Nor could Petitioner claim an interest in Vannoy's plea agreement as a third-party beneficiary because Prosecutors and Vannoy obviously did not enter into the plea agreement for Petitioner's benefit: to the contrary, they entered into the plea agreement to the detriment of Petitioner because the agreement required Vannoy to testify against Petitioner. Because Petitioner lacked an interest in Vannoy's plea agreement, he could not have suffered any due process deprivation as a result of any breach of that agreement. Therefore, his *Santobello* claim cannot succeed.

In addition, Petitioner's *Santobello* claim fails for the additional reason that no violation of Vannoy's plea agreement in fact occurred. Prosecutors upheld their end of the bargain: at Vannoy's sentencing hearing, they recommended a sentence of seventeen years of incarceration, just as the plea agreement required them to do. The sentencing court was not bound by the plea agreement, disregarded prosecutors' recommendation, and sentenced Vannoy to ten years in prison rather than the seventeen years to which prosecutors and Vannoy agreed. Because the sentencing court's decision does not constitute a breach of the plea agreement, Petitioner cannot succeed on his *Santobello* claim.

**j.    Petitioner's claims pursuant to *Connick v. Thompson* and *Cash v. Maxwell***

Petitioner purports to raise independent claims based on *Connick v. Thompson*, 563 U.S. 51 (2011),[33] and *Cash v. Maxwell*, 565 U.S. 1138 (2012).[34]  Neither claim has merit.

Assuming without deciding that *Thompson* has some bearing on Petitioner's case, *Thompson* cannot be the basis of a claim because the Supreme Court decided *Thompson* on March 29, 2011, well after the Appellate Division adjudicated Petitioner's claims on May 19, 2009.  *Wright*, 878 N.Y.S.2d at 788.  A state court cannot have contradicted or have unreasonably applied clearly established Supreme Court precedent if the precedent did not exist at the time of the state court's decision.  *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

In addition, *Maxwell* cannot be the basis of a claim because the Supreme Court's decision in that case merely denied a petition for a writ of certiorari; the Supreme Court issued no holding.  *See Maxwell*, 565 U.S. at 1139 (Sotomayor, J., concurring).  This Court may not grant federal habeas relief unless a state court merits adjudication contradicts or unreasonably applies clearly established federal law as established by the Supreme Court — that is, the Supreme Court's holdings, not its dicta.  *See Carey v. Musladin*, 549 U.S. 70, 74 (2006).  A statement respecting the denial of certiorari does not carry the precedential authority of an opinion supported by a majority of the Supreme Court.  *See United States v. Brooks*, No. 06-CR-550, 2009 WL 3644122, at *12 (E.D.N.Y. Oct. 27, 2009) ("[D]enials of certiorari have no precedential force." (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 94 n.11 (1983))).

---

[33]  In *Connick v. Thompson*, the Supreme Court held that a district attorney's office may not be held liable under 42 U.S.C. § 1983 for failure to adequately train prosecutors about their duty to produce exculpatory evidence based on a single *Brady* violation.  563 U.S. 51, 54 (2011).

[34]  In *Cash v. Maxwell*, the Supreme Court denied certiorari where the Ninth Circuit had granted habeas relief based on evidence that a jailhouse informant had lied about the respondent's supposed confession at the respondent's trial in 1984.  565 U.S. 1138 (2012) (mem.).

Assuming without deciding that the state courts contradicted or unreasonably applied Justice Sotomayor's statement respecting the denial of certiorari in *Maxwell*, this cannot form the basis of federal habeas relief.

## III. Certificate of appealability

Having denied the petition for a writ of habeas corpus, the Court issues a certificate of appealability for (1) Petitioner's claim regarding the ineffective assistance of trial counsel in connection with the prosecutorial cross-examination of Petitioner's alibi witness Cooper, (2) Petitioner's sufficiency of the evidence claim, (3) Petitioner's Eighth Amendment "gross disproportionality" claim, and (4) Petitioner's *Agurs*, *Brady*, and *Santobello* claims and their associated ineffective assistance of counsel claims. The Court denies a certificate of appealability as to all other claims.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) Gov'g § 2254 Cases in the U.S. Dist. Cts. A court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that a habeas petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759, 773 (Feb. 22, 2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and "[courts] should not decline the

application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief." *Welch v. United States*, 578 U.S. ---, ---, 136 S. Ct. 1257, 1263–64 (Apr. 18, 2016) (quoting *Miller-El*, 537 U.S. at 337). In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 337–38.

The Court grants a certificate of appealability as to Petitioner's claim regarding the ineffective assistance of trial counsel in connection with the prosecutorial cross-examination of Petitioner's alibi witness Cooper. New York law imposes a multi-part test for the foundation required to impeach an alibi witness based on the witness' failure to come forward earlier. Each part of the test is sufficiently malleable to generate debate among reasonable jurists of whether the foundation for Cooper's testimony satisfied each element of that test. The related ineffective assistance of counsel framework is likewise not capable of reduction to hard-and-fast rules that would preclude discussion among judges. The same is true of Petitioner's sufficiency of the evidence claim as the totality of the circumstances analysis requires judges to review all of the evidence and make a commonsense judgment about what reasonable juries could or could not do. While the high standard for ineffective assistance claims and sufficiency of the evidence claims — coupled with the extra hurdle of section 2254(d) deference — suggest that any judge to adjudicate this claim would reach the same conclusion as this Court, these claims are nonetheless debatable. Therefore, the Court must issue a certificate of appealability.

The Court likewise issues a certificate of appealability for the Eighth Amendment "gross disproportionality" claim. Given the unclear and ill-defined caselaw governing the Supreme Court's "gross disproportionality" jurisprudence, reasonable jurists could debate the exact

contours and limits of the doctrine and whether Petitioner's sentence falls within them. While the high standard on the merits ("*grossly* disproportionate") coupled with the deference required from section 2254(d) suggest that each debate would end with all reasonable jurists agreeing to reject Petitioner's claim, the possibility of debate alone warrants issuance of the certificate of appealability.

Finally, Petitioner's *Agurs*, *Brady*, and *Santobello* claims (and the accompanying claims for ineffective assistance of appellate counsel) warrant a certificate of appealability. First, these claims do not have the added hurdle of section 2254(d) deference applicable to several other claims, making them more debatable. Second, the scope of these claims — having been written by a *pro se* Petitioner — is unclear, and reasonable jurists could debate whether the Court has correctly interpreted Petitioner's arguments and assigned the correct legal framework. The claims on their merits raise novel issues — for example, one defendant's due process interest in the enforcement of another defendant's plea agreement, or the timing of the *Brady* disclosure obligation — that could generate discussion among judges. While the facts of Petitioner's case and the novel nature of his claims create an uphill battle for Petitioner on the merits, the Court nevertheless must issue a certificate of appealability.

With regard to the remaining claims, none warrant a certificate of appealability and the Court declines to issue a certificate of appealability as to any. No reasonable jurist would debate whether a procedural bar applies to Petitioner's claims with regard to the cross-examination of defense witnesses Wright and Gousse or the admission into evidence of the confessional statement of Petitioner's accomplice Vannoy. No reasonable jurist would debate this Court's freedom to summarily reject an ineffective assistance of counsel "claim" (regarding trial counsel's failure to object to the admission of Vannoy's written statement) that constitutes no

more than a sentence in a state court filing and receives no elaboration in filings before this Court. Similarly, no reasonable jurist would debate whether a federal habeas court may adjudicate issues of state law like Petitioner's "weight of the evidence" claim, his request for an "interest of justice" reduction in his sentence, or the applicability of the state hearsay rule to Petitioner's aunt's testimony about his telephone call to her. In addition, no reasonable jurist would debate whether a state court unreasonably applies clearly established Supreme Court precedent — like *Connick v. Thompson* — that does not exist at the time of the state court decision. Finally, no reasonable jurist would debate whether a single-justice statement concerning the denial of a petition for certiorari can form the basis for a grant of habeas relief. Each of these claims is straightforward and they fail to meet even the extraordinarily low bar for issuance of a certificate of appealability. Accordingly, the Court declines to issue a certificate of appealability for any of these remaining issues.[35]

## IV. Conclusion

For the reasons explained above, although the Court finds that it possesses subject matter jurisdiction over this petition, the Court nevertheless declines to grant habeas corpus relief as to any of Petitioner's claims and denies the petition for a writ of habeas corpus.[36] The Court grants a certificate of appealability for Petitioner's claim regarding the ineffective assistance of trial counsel in connection with the prosecutorial cross-examination of Petitioner's alibi witness Cooper, Petitioner's sufficiency of the evidence claim, Petitioner's Eighth Amendment "gross

---

[35] The government does not require a certificate of appealability to appeal this Court's determinations that (1) the petition is not moot and (2) Petitioner meets the statutory custody requirement. *Lurie v. Wittner*, 228 F.3d 113, 121 (2d Cir. 2000).

[36] The Court vacates its order of May 1, 2020, referring the case to Magistrate Judge Steven Tiscione for a report and recommendation.

disproportionality" claim, and Petitioner's *Agurs*, *Brady*, and *Santobello* claims and their associated ineffective assistance of counsel claims. The Court denies a certificate of appealability as to all other claims.

In light of Petitioner's release from prison and deportation since the filing of his petition, the government is directed to use reasonable efforts to locate Petitioner and serve him with a copy of this Memorandum and Order. At minimum, the government must (1) mail a copy of this order to the address identified in the record, (Tr. 259, 285, 319–20, 377), as the address at which Petitioner resided prior to his arrest in this case and (2) must contact DOCCS to learn whether it maintains updated contact information for Petitioner, and if so, use that contact information to provide Petitioner with a copy of this Memorandum and Order. Within fifteen days after the issuance of this Memorandum and Order, the government must file a certificate of compliance detailing its efforts to comply with this paragraph.

Dated: July 2, 2021
      Brooklyn, New York

                                      SO ORDERED:

                                          s/ MKB

                                  _____
                                  MARGO K. BRODIE
                                  United States District Judge